Good morning, Your Honors. Good morning, Mr. Jordan. Megan Hoffman appearing on behalf of the appellant, Brian Garnett. I'm going to attempt to reserve two minutes for rebuttal. All right. Thank you. I'd like to start off by discussing the errors in this case and our argument that we presented in the opening brief, that the state court findings, in particular as to the ineffective assistance of counsel claim, are entitled to no deference by this court. The reason for that is threefold. The first is that the Nevada Supreme Court, in analyzing the ineffective assistance of counsel claim on appeal, used the wrong legal standard. And the federal district court in this case recognized that the Nevada Supreme Court had in fact used the wrong legal standard, which was that they had to show by clear and convincing evidence that trial counsel were ineffective. And the district court analyzed it under the Strickland verdict, but did recognize that the Nevada Supreme Court had in fact used an improper legal standard. In addition to that, the Nevada Supreme – in this court, excuse me, in this particular case, the state court findings are also entitled, the state district court findings are entitled to no deference, because in particular as to the ineffective assistance of counsel claim, but also as to all of the claims. The ineffective assistance of counsel claim, the state court made no findings in its initial minute order on ineffective assistance of counsel. The minute order simply found that the expert witness that was used by the defense at the evidentiary hearing, that his testimony was not enough, but he didn't make any findings in particular as to the ineffective assistance of counsel. The state, in an order prepared solely by the state, in which the defense counsel had no opportunity to give input or to object, the state then created its own legal findings, its own factual findings, which the state district court then signed off on. And we would argue that under Taylor v. Maddox, that finding, that fact-finding process was also defective. And lastly, the – And the final question that I would undertake, according to you, was to have somebody come in and analyze these tapes as a third party and do a height analysis, or is there more that the counsel should have done? In this particular case, it was that trial counsel should have had this videotape analyzed for the purpose of attempting to ascertain the height of the robber. So it's really a height analysis question. It was. And in addition to that, another reason that the – that we would argue that the findings are defective is that trial counsel also asked the court, the state trial court, and received – asked for and received an order to conduct a reenactment of the actual crime with someone of similar height characteristics and physical features as the defendant, and he was granted permission to do that by the court. But he didn't do it. Correct. He didn't do either. Ms. Casey, is there such a thing as a height analysis expert? I realize there's an eyewitness expert. And here, since the only evidence against your client, eyewitnesses, but your argument that he should have called in a height analysis expert, I didn't know anything like that existed. I think that the argument that – it didn't have to be a height analysis expert per se. In this case, the argument was that the – because, Your Honor, you're correct that the only evidence in this case linking Mr. Garnett to this scene was eyewitness testimony, and every eyewitness that testified at the trial put Mr. Garnett at at least 5 inches – or put the robber, excuse me, at at least 5 inches shorter than Mr. Garnett was. The – all of the witnesses put Mr. – put the robber at between 5'6 and 5'8". Mr. Garnett was measured at the evidentiary hearing as 6'1". That's a good 5 inches shorter than anyone at trial testified the robber was. But what about the video evidence being identified by the other person who's seen him come in and out of the store before and says, well, that's him? That evidence, Your Honor, I would argue is – first of all, I would encourage you to watch the videotape that was submitted in this case. The videotape – But, no, because I'm not – that's what the witness testified to. Correct. And I would argue that that's inconsistent. The videotape evidence in this case was unclear. The videotape evidence in this case is very grainy, and we can see that the videotape evidence is incredibly grainy. It's not a very good videotape. It's not. You're correct. I don't see why we should watch it again. I think it's just for the point that the clerk's testimony that she somehow was able to see the robber of such clarity and to determine that his hair was a particular style that perhaps – But she knows this guy. I mean, she's familiar with him, so – She had met him once. Yeah. Or, excuse me, she had met him a few times, correct, coming into the store. Because he came in and out, so he says, oh, that's the guy. So there's that testimony. And then I guess the question is, why do you need a height expert if there were such a thing, when in fact, you know, you have common sense, which is these eyewitnesses testify to a height that this guy isn't? I would argue – I mean, what – I don't understand why, when it's not necessarily a recognized kind of expert, why it would be ineffective assistance not to call such a person. And they didn't even have such a person to call, because the guy who was even sort of semi on tap was not even a so-called height expert. Well, the – So what is your response to that? My response to that, Your Honor, is that the – the crux of the issue here is that trial counsel was ineffective for not trying to analyze the height – or for not – excuse me, for not trying to enhance the videotape so as to determine a height of the actual suspect. The only way that this tape could have been analyzed, according to Mr. Hathaway, the expert, the NASA expert in this case, was that the tape was so grainy, it was – and yes, this man had facial hair. Yes, this man had longer hair. The tape was grainy. But you could, using mathematical applications, look at this tape and determine the height of a suspect. And the height, our argument in this case, is something that cannot be changed. A person cannot grow or shrink five inches overnight. A person might be able to change their hairstyle. They might be able to shave their beard. But they're not able to determine their height. And in a case where it's – yes, sir. Was it the clerk in the store who looked at this fellow, the robber, for eight minutes and then he testified at trial, that's the defendant, that's the guy that did the robbery? There is conflicting testimony, Your Honor, about whether it was – Pardon me? There is conflicting testimony as to whether it was three minutes or eight minutes. Yes, the – yes, the clerk did stare at this person for a particular amount of time. And his initial identification from the photo lineup was only after staring at it for 15 minutes, only after eliminating every other picture within the lineup, and then determining that he was only 85 percent sure that my client was – At trial, he was 100 percent sure. At trial, his memory got better. That is correct. Is it correct? In the photo lineup, there was a similar background to everyone except your client. That's correct. And, in fact, in addition, if I can just go back for a moment, as to the clerk who identified Mr. Garnett from the videotape, we would also challenge her testimony and, in fact, we did in the briefing under the – under the auspice that she did, in fact, view this videotape, but she was not present during the robbery. And in addition to that, there was the problem with both the woman, the clerk who viewed it on the videotape and the woman who identified or whose $100 was stolen by the robber across the counter, that those were also cross-racial identifications, and those have also been demonstrated to be suspect, particularly. Yes, but that was not the evidence before the jury, was it? Well, this was – I mean, that's one of – that issue – You're saying that we should have had an identification expert come in and explain how these people could be wrong. That issue was not certified. It was raised in this court, and that's – and that – that's correct. That was not certified. The jury did see that those two people were cross-racial, but there was never any argument brought to them that that would have been a suspect identification. See, the thing that occurred to me, Ms. Hoffman, is maybe if we call the clerk in the store the victim, you know, maybe he was wrong about the height. Maybe the fellow really is – the robber really was 6'1". He said he thought he was 5'8", or 5'6"-5'8". 5'8", yes. So he could be wrong. I can't judge your height. I mean, I don't know how tall you are. I think you're, what, 5'2"-5'3"? 5'2". You're exactly right, actually. So, Your Honor, I would not challenge that. The video isn't grainy here. That's true. You see what I'm getting at. He might have just simply misstated the height. Your Honor, I would agree with that if he wasn't accurate as to almost every other measurement that he testified to at trial. When he measured distance, when he measured height, when he measured other things, if you go back and look at the testimony, that witness was fairly accurate as to every other estimate that he provided as to the length of the counter, the height of the door, the distance between the slot machines and the counter, the distance, in fact, of the height of the counter. Those things, he was very accurate. And so to the extent that he would be off by 5", I find hard to believe given the rest of his testimony and his estimations and others. And with that, I'm almost out. So I'd like to at least try to reserve a couple of moments if you don't have any more questions for me. That's fine. Thank you. Good morning, Your Honors. My name is Jason Dorn. I'm a Deputy Attorney General. I'm representing the State of Nevada in this matter. As the Court knows, we're here because of the three issues that were presented by the Federal Public Defender on behalf of Mr. Garnett. The first one, which opposing counsel spent a majority of time talking on, was whether or not counsel was ineffective for failing to engage the services of an expert witness with regard to the eyewitness testimony. I think that we can see that the Strickland test was ultimately applied in this particular case, and when the facts of the Strickland test were applied to all of the evidence involved, including the evidence from the post-conviction evidentiary hearing, I think that the elements of the Strickland test were met. Let me just ask a question, then. The only evidence connecting Garnett with the crime was eyewitness evidence. Why is in this case you mentioned in your brief that it is rare that identification experts are used? They're used only in a minority of cases. Why isn't this the very case that an eyewitness expert should be used when it's the only evidence against Mr. Garnett? Well, I think when you look at the totality of the circumstances, in this particular case, the videotape was sought to be analyzed by opposing counsel or by the defense counsel in this matter. But it wasn't, that wasn't available. And so at that point, one can only glean that defense counsel decided that he would argue it in the manner in which he did. And quite frankly, I mean, he presented the best case that he thought he could. He presented two alibi, excuse me, he presented an alibi witness. He presented the two witnesses who were in the store who testified that they knew Mr. Garnett and that the robber was not Mr. Garnett. There was testimony as to Mr. Garnett's height that was presented before the trial. The opposing counsel, excuse me, Mr. Amesbury, had Mr. Garnett stand beside him and was demonstrated to the jury that Mr. Garnett was indeed taller than 5'8 or 5'6 as some of the witnesses opined. And I think one thing that was brought out a little earlier was that the clerk, the victim in this case, testified that he or his initial report was that the robber was 5'8. But when you look at the totality of that, of his police report, it indicates that he spent a good deal of time looking at the robber while the robber was crouched. And so, you know, as was pointed out, some people are good at testifying about height and some people aren't. And in this particular case, this robber, Mr. Garnett, was crouched a good percentage of the time, so it would be difficult to tell how tall he is when he's crouched. And I think that it was also brought out on a number of occasions that there are other factors that can determine actually how tall an individual is. As someone who habitually stoops myself, many people underestimate how tall I am. And as my mother would say, if I stood up straighter, I would look taller and more handsome. I doubt the last part of that, but I think she's right as far as the first part, that if I did stand up straight, I would probably look more tall than I am indeed. What about the jumping over the counter? He got the defense counsel got permission to have this reenactment, and that's a big part of it is, you know, could somebody actually sort of catapult the counter based on your height? And then that kind of went into the ether as far as the defense counsel's strategy. And that, too, would have been at least an objective ability to talk about the height. Was that ineffective? I don't believe it was ineffective. I think when you look at the testimony of Mr. Amesbury, he testified that he considered having it done, but he opted, he made a tactical decision to argue the issue in another way. And that way was to present the alibi witnesses, to show the discrepancies in the individual's police reports, as opposed to Mr. Garnett's actual description. But in this case, you've got to go back to the reason that he was convicted. And the reason that he was convicted was because an individual looked at the tape and said, I know that guy. He comes in here. He's introduced himself to me. He's given me his phone number. That's, you know, Mr. Garnett. And you have the clerk. Counsel, let me just ask on ineffective assistant counsel, you said it was a tactical decision what the lawyer did, but there's nothing in the record that shows he even considered calling an eyewitness expert in. He just didn't do it, period. He did not consider calling an eyewitness expert as far as the record is concerned. But those issues were argued before the jury, that it was a different individual. And Mr. Amesbury also sought to have the videotape enhanced so that the physical characteristics of the videotape could have been discerned. And Mr. Amesbury's view would have showed that there were physical discrepancies between the individual who robbed the store and Mr. Garnett. Obviously, that information was presented to the jury. And, you know, let's keep in mind, the jury has an opportunity to sit and to look at Mr. Garnett while he's in trial. They have an opportunity to do things that we can't do here, like determine his posture. But they may not have knowledge that when people are identifying people that you have these cross-racial differences, when you have one person is black, one person is white, how they remember them and so forth. Well, none of that was introduced. Is that correct? That's true. But my experience has been is that the cross-racial identification people or the eyewitness experts will tell you when they're testifying that things like whether you have personal knowledge of an individual would greatly affect the cross-racial identification. And in this particular case, the clerk was actually African-American as well. So there's not a cross-racial identification there. And then you have the other witness, the person who saw him on the tape and said, I know that guy. She knows him. So, you know, they've had obviously enough conversations such that Mr. Garnett felt comfortable asking this woman out and giving her his phone number. And he's asking for her phone number. Phone number, yes, yes. All right. In your view, I mean, there's some confusion about whether the eyewitness testimony and height testimony expert related to cross-racial issues or to this height issue. In your view, did he properly raise the issue as to whether there should have been an expert called on the what we would think of as a more true eyewitness testimony basis? In terms of pointing out the discrepancies between cross-racial? Well, whether he properly raised that in his petition. Judge, I apologize. I'm not sure exactly where the Court's coming from. Are you saying? Well, I mean, he definitely raised the video issue. Yes. I guess I just was wondering whether you think he properly raised the separate issue of a true eyewitness expert and whether that was ineffective assistance of counsel. No, I think that he opted to argue it, as I said, the tactical decision to argue it with the other evidence that he had. Well, why do you call that tactical? Excuse me, counsel, for interrupting. You keep saying it was a tactical decision. Yes. What evidence was there that it was a tactical decision? Well, I think if you look at the totality of the defense Mr. Amesbury put on, he put on the alibi witness to indicate that Mr. Garnett wasn't present at the scene of the robbery. He also put on the two witnesses who were playing video poker in the rear part of the store, the side part of the store, who indicated that that was not Mr. Garnett, the robber was not Mr. Garnett. And as I said, he argued the issue of height, quite frankly, in a way that many jurors can relate to. I'm six foot tall. He's six foot tall. Everyone described him as being 5'6 to 5'8". Certainly a jury that can be more powerful to a jury than having a NASA expert testify as to geometry and trigonometry, which could at times go right over the head of a juror. If you have no other questions, thank you. Thank you. I think you've used up most of your time, but why don't we put a minute on the clock so that she'll have some time for rebuttal. Just very quickly, just a couple of points. The first point is I believe in the brief, and Mr. Jordan also just mentioned it now, that there's some question as to whether this technology was available in 2001 at the time of the trial. And at the time of the trial, this technology had been available for five years. It won the NASA Space Technology Award of the Year in 2002, but it also won the Space Technology Hall of Fame Award in 2001, and it was available as far back as 1996. So I don't want there to be confusion as to whether or not this technology was available for counsel had he chosen to use it. I also would like to point out that in his closing arguments, you know, my argument is that this might have been a tactical decision, although there is no evidence of whether or not he should have called an eyewitness identification expert in trial. That's correct. That's not in the record as to whether or not he made a tactical decision on that front. But as to whether or not how he was going to enhance the videotape, I believe it was unreasonable for him not to have considered to enhance the tape as to height when in his closing argument he realized how important height was in this case. I thought there was some testimony that he was concerned that if he did any tinkering with the videotape, that it actually might degrade the tape. That's correct, as to physical characteristics. And the argument there is that the tape is very grainy. We can see that that's not an issue. And as to enhancing it to determine facial features, hair, you know, something as to that nature, the tape was going to be more grainy had they enhanced it. But this technology, and that's why this is in particular in this height case was so critical, that this technology could have determined that Brian Garnett, it was a physical impossibility for him to be the robber because he was five inches too tall. And that is something that could not be changed, could not have been enhanced, could not have been changed, you know, by Mr. Garnett leaving and changing his appearance in some way. This was something that trial counsel could have shown to the jury as an affirmative fact, that this person, Mr. Garnett, was not the robber that day. Thank you. Thank you. Thank both counsel for your argument. The case of Garnett v. Nevin is submitted. And I guess we'll say goodbye to our lawyers from Nevada now, from both the Deputy Attorney General and the Federal Defender.
judges: Nelson D. W., Thompson, McKeown